CLIFFORD E. YIN (State Bar No. 173159)
ZUZANA S. IKELS (State Bar No. 208671)
COBLENTZ, PATCH, DUFFY & BASS LLP
One Ferry Building, Suite 200
San Francisco, California 94111-4213
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email:   ef-cey@cpdb.com,
         ef-zsi@cpdb.com

Attorneys for SafeDesk Solutions, Inc. and
Phil Autrey

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DATA CAPITAL CORPORATION, a California Corporation,<br><br>           Plaintiff,<br><br>     v.<br><br>SAFEDESK SOLUTIONS, INC., an Oregon Corporation; PHIL AUTREY, an individual; DOES 1 through 25, inclusive,<br><br>           Defendants. | Case No. CV-08-00678 JW (HRL)<br><br>**DECLARATION OF ZUZANA S. IKELS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Date:           June 30, 2008<br>Time:          9:00 a.m.<br>Place:          8, Fourth Floor<br>Judge:         Hon. James Ware |

I, ZUZANA S. IKELS, declare as follows:

1.       I am an attorney at law duly licensed to practice in the State of California and admitted to practice in the United States District Court, Northern District of California. I am an associate in the law firm of Coblentz, Patch, Duffy & Bass LLP ("CPDB"), counsel of record for defendants SafeDesk Solutions, Inc., and Phil Autrey. I make this declaration in support of defendants' Motion to Dismiss the First Amended Complaint (the "Motion to Dismiss"). I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and as to those, I believe them to be true. I have custody of the files relating to this action,

COBLENTZ, PATCH, DUFFY & BASS LLP
ONE FERRY BUILDING, SUITE 200, SAN FRANCISCO, CALIFORNIA 94111-4213
415.391.4800 · FAX 415.989.1663

and am familiar with their contents.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the original complaint filed by Plaintiff Data Capital Corporation ("Data Capital") on December 7, 2007.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the redline comparison of the allegations asserted in the original complaint and those alleged in the First Amended Complaint, filed by Data Capital on March 12, 2008.  For ease of reference, the red-line only compares the actual text, namely the allegations found within the pleadings; it does not include the caption page or side bar pleadings.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed March 31, 2008, at San Francisco, California.

DATED: March 31, 2008                    COBLENTZ, PATCH, DUFFY & BASS LLP


By:    _____/s/_____
        Zuzana S. Ikels
        Attorneys for SafeDesk Solutions, Inc.
        and Phil Autrey

Coblentz, Patch, Duffy & Bass LLP
One Ferry Building, Suite 200, San Francisco, California 94111-4213
415.391.4800 · Fax 415.989.1663

IKELS DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**EXHIBIT A**

1   LAW OFFICES OF JULIAN A. POLLOK
    A Professional Corporation
2   1000 Wilshire Boulevard, Suite 620
    Los Angeles, CA  90017-2463; STATE BAR NO. 48484
3   (213) 688-7795

4   Attorneys for Plaintiff
    Data Capital Corporation

5

6

7

8

9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                       SANTA CLARA COUNTY

11

12  DATA CAPITAL CORPORATION, a          )   Case No. **1 07 CV 1 0 0 5 8 7**
    California Corporation,               )
13                                        )
                 Plaintiff,               )   **COMPLAINT**
14                                        )   **(DECLARATORY RELIEF; BREACH**
                 vs.                      )   **OF CONTRACT; BREACH OF**
15                                        )   **FIDUCIARY DUTY; INTERFERENCE**
    SAFEDESK  SOLUTIONS, INC., an         )   **WITH ADVANTAGEOUS BUSINESS**
16  Oregon Corporation; PHIL AUTREY, an   )   **RELATIONSHIPS; INJUNCTIVE**
    individual; DOES 1 through 25, inclusive )   **RELIEF)**
17                                        )
                 Defendants.              )
18  _____ )

19

20      PLAINTIFF, for a claim against defendants, and each of them, alleges:

21      <u>**GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**</u>

22      1.  Plaintiff is a corporation existing and authorized to do business pursuant to the laws of the

23  State of California, maintaining its principal place of business in San Jose, California.

24      2.  Defendant SafeDesk Solutions, Inc. ("SafeDesk") is an Oregon corporation maintaining its

25  principal place of business in Spokane, Washington.

26      3.  Defendant Phil Autrey is an individual whom plaintiff is informed and believes, and upon

27  that basis alleges, resides in Spokane, Washington.

28  ///

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

1        4. Plaintiff is currently unaware of the true names and capacities of the defendants sued herein

2    as DOES 1 through 25, inclusive, and thus proceeds against those defendants by their fictitious names.

3    When the true names and capacities of the fictitiously names defendants have been ascertained, plaintiff

4    will amend this complaint to set forth those true names and capacities. At all times material hereto each

5    defendant was acting as the duly authorized agent, representative and employee of each of the remaining

6    defendants and, in performing the acts herein alleged, was acting within the course and scope of that

7    agency and employment.

8        5. Plaintiff is a provider of IT management solutions and services for large government and

9    telecommunications companies. Defendant SafeDesk is a developer of software. At all times material

10   hereto defendant Autrey was the President and Chief Executive Officer of SafeDesk. Autrey and

11   SafeDesk had developed and owned a variety of intellectual property, collectively referred to herein as

12   the "SafeDesk IP".

13       6. Beginning in early 2007 the parties entered into negotiations for, inter alia, the acquisition

14   by DCC of the SafeDesk IP and other assets of SafeDesk and Autrey. On June 8, 2007 the parties

15   entered into that certain "IP Asset Sale and Purchase Agreement between SafeDesk and Phil Autrey

16   (Seller) and Data Capital Corporation (Buyer)", a true copy of which is attached as Exhibit "1" and

17   incorporated herein by this reference (the "Agreement"). Pursuant to the Agreement, SafeDesk and

18   Autrey transferred ownership to DCC of, inter alia, all of the SafeDesk IP. Plaintiff has performed all

19   terms and conditions of the Agreement required to be performed by it, except as performance has been

20   excused by the acts of defendants.

21       7. Subsequent to the parties entering into the Agreement, the parties began communications

22   with British Telecommunications PLC ("BT") concerning the potential licensing and/or sale of certain

23   of the SafeDesk IP owned by DCC to BT. In connection therewith, on or about July 11, 2007 the parties

24   entered into that certain Confidentiality Agreement with BT, a true copy of which is attached hereto as

25   Exhibit "2" and incorporated herein by this reference. Included in the "Background" recitals of the

26   Confidentiality Agreement was the recital that "Data Capital is the owner of all of Safe Desk's

27   intellectual property consisting of computer and machine software, software code and software

28   products, . . . which includes . . . SafeDesk Thin & Hybrid Clients."

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

Complaint                                              -2-

8. Thereafter the parties jointly prepared and submitted a proposal to BT for sales/licensing of SafeDesk IP owned by DCC.   The parties anticipate that, if the proposal to BT is accepted, the parties' profits will be in the millions of dollars.

9. Plaintiff has been advised by defendants, acting through their counsel, that defendants assert that they are not bound by the Agreement, are entitled to rescission of the Agreement and that defendants' rights to  pursue the business opportunity with BT "are in no way dependant upon the validity or invalidity of the June 8, 2007 document [the Agreement]."  Plaintiff is informed and believes, and upon that basis alleges, that defendants are attempting to usurp the business opportunity of a sale/license to BT for their own benefit, to the exclusion of plaintiff.

## FIRST CAUSE OF ACTION

### (DECLARATORY RELIEF AGAINST ALL DEFENDANTS)

10. Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.

11. Plaintiff contends that the Agreement is a binding and subsisting contract between plaintiff and defendants, that plaintiff's rights under the Agreement include ownership of all of the SafeDesk IP, that therefore defendants are not entitled to make use of the SafeDesk IP without the consent of plaintiff, or to make use of the SafeDesk IP for the benefit of parties other than plaintiff, and that any relationship with BT concerning use of the SafeDesk IP is for the benefit of plaintiff.  Plaintiff is informed and believes, and upon that basis alleges, that defendants dispute each of these contentions.

12. Plaintiff is entitled to a judicial declaration of this court resolving the disputes of the parties as hereinabove alleged.  Such a determination is necessary and appropriate in order to avoid a multiplicity of actions, and in order that the parties can determine their respective rights and obligations under the Agreement.

///
///
///
///

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

Complaint                                          -3-

1

## SECOND CAUSE OF ACTION

2

(AGAINST ALL DEFENDANTS FOR BREACH OF CONTRACT)

3      13.  Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1

4  through 9 above.

5      14.  Defendants have breached the Agreement by refusing to recognize and by challenging the

6  fact that plaintiff is the owner of the SafeDesk IP, and by acting in derogation of plaintiff's rights as the

7  owner of SafeDesk IP by attempting to negotiate and contract with BT in their own right and in their

8  own name to sell/license portions of the SafeDesk IP to BT.

9      15.  As the direct and proximate result of defendants' breaches of the Agreement as herein

10  alleged, plaintiff has sustained damage in a sum which cannot be presently ascertained, but which

11  plaintiff is informed and believes, and upon that basis alleges, exceeds the sum of four million dollars.

12  Plaintiff is entitled to recover its damages from defendants in accordance with proof at time of trial.

13

14

## THIRD CAUSE OF ACTION

15

(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

16      16.  Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1

17  through 9 and 14 above.

18      17.  Inherent in the Agreement is the implied covenant of defendants to at all times act in good

19  faith and to deal fairly with plaintiff.  This covenant includes the obligation not to perform acts which

20  interfere with or adversely affect the financial benefit of the Agreement to plaintiff.

21      18.  Defendants, by asserting that the Agreement is not operative, should be (or is) rescinded

22  and in attempting to usurp the benefits of the relationship with BT for themselves, have breached the

23  covenant of good faith and fair dealing inherent in the Agreement.

24      19.  As the direct and proximate result of defendants' acts as herein alleged, plaintiff has

25  sustained damage in a sum which cannot be presently ascertained, but which plaintiff is informed and

26  believes, and upon that basis alleges, exceeds the sum of  four million dollars.  Plaintiff is entitled to

27  recover its damages from defendants in accordance with proof at time of trial.

28  ///

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

Complaint                                    -4-

**FOURTH CAUSE OF ACTION**

(BREACH OF FIDUCIARY DUTY)

20.  Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.

21.  As a result of the agreements and obligations of the parties as set forth in the Agreement, and also as the result of the joint proposal being prepared and submitted to BT,  defendants became fiduciaries of plaintiff and owe plaintiff the obligations of fiduciaries.

22.  The acts of defendants as herein alleged constitute breaches of defendants' fiduciary duties owed to plaintiff.  The acts of defendants that constitute the breaches of fiduciary duty were performed intentionally, with malice, and with  an intent to injure plaintiff and its financial interests.

23.  As the direct and proximate result of the acts of defendants as alleged herein, plaintiff has been damaged in a sum which cannot be presently ascertained, but which plaintiff is informed and believes, and upon the basis alleges, exceeds the sum of four million dollars.  Plaintiff is entitled to recover its damages in accordance with proof at time of trial herein.

24.  The acts of defendants as alleged herein were performed intentionally and maliciously, with an intent to injure and oppress plaintiff.  Plaintiff is therefore entitled to recover additional damages, as both an example and a penalty, in order to punish defendants for their acts and to deter them from the commission of the same or similar acts in the future.

**FIFTH CAUSE OF ACTION**

(AGAINST ALL DEFENDANTS FOR INTERFERENCE WITH

ADVANTAGEOUS BUSINESS RELATIONSHIP)

25.  Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.

26. The relationship between plaintiff and BT constituted an advantageous business relationship to plaintiff and defendants were at all times aware of the existence of that advantageous business relationship.

///

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

Complaint                                                    -5-

27. Defendants have intentionally interfered with the advantageous business relationship between plaintiff and BT in attempting to usurp the business opportunity represented by that relationship as hereinabove alleged, and by attempting to exclude plaintiff from benefitting from that relationship.

28. As the direct and proximate result of the acts of defendants as herein alleged, plaintiff has been damaged in a sum which cannot be presently ascertained, but which plaintiff is informed and believes, and upon that basis alleges, exceeds the sum of four million dollars. Plaintiff is entitled to recover its damage from defendants in accordance with proof at time of trial.

29. The acts of defendants as alleged herein were performed intentionally and maliciously, with an intent to injure and oppress plaintiff. Plaintiff is therefore entitled to recover additional damages, as both an example and a penalty, in order to punish defendants for their acts and to deter them from the commission of the same or similar acts in the future.

## SIXTH CAUSE OF ACTION

### (AGAINST ALL DEFENDANTS FOR INJUNCTIVE RELIEF)

30. Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 and 26 through 27 above.

31. The SafeDesk IP is unique and cannot be readily duplicated. No adequate remedy at law exists for defendants' usurpation and use of the SafeDesk IP owned by plaintiff. Plaintiff will sustain irreparable injury and damage if defendants are allowed to use and sell/license the SafeDesk IP to others.

32. Plaintiff is therefore entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining defendants from any use, sale or licensing of the SafeDesk IP.

///
///
///
///
///

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

1       WHEREFORE, plaintiff is entitled to judgment herein against all defendants, jointly and

2  severally, as follows:

3       1. On the first cause of action, for a declaration that the Agreement is a valid and subsisting

4  Agreement, that plaintiff is the owner of the SafeDesk IP as a result of the Agreement, and that

5  defendants are not entitled to sell/license the SafeDesk IP to third parties;

6       2. On each of the second, third, fourth and fifth causes of action, for damages exceeding four

7  million dollars in accordance with proof at time of trial;

8       3. On each of the fourth and fifth causes of action, for additional damages, as both an example

9  and a penalty;

10       4. On the sixth cause of action, for issuance of a temporary restraining order, preliminary

11  injunction and permanent injunction;

12       5. For costs incurred herein; and

13       6. For such further relief as the court deems appropriate.

14  DATED: December 7, 2007

15

16            LAW OFFICES OF JULIAN A. POLLOK

               A Professional Corporation

17

18

19            By:

               Julian A. Pollok

20            Attorneys for Plaintiff

               Data Capital Corporation

21

22

23

24

25

26

27

28

LAW OFFICES OF
JULIAN A. POLLOK
A Professional Corp.
LOS ANGELES

Complaint               -7-

EXHIBIT 4

**IP ASSET SALE AND PURCHASE AGREEMENT BETWEEN SAFEDESK AND PHIL AUTREY (SELLER) AND DATA CAPITAL CORPORATION (BUYER)**

## ARTICLE I.  IP ASSET SALE AND PURCHASE AGREEMENT

This ASSETS SALE AND PURCHASE AGREEMENT ("Agreement") is made and entered into as of ~~June 8, 2007~~, by and between, SafeDesk Solutions, Inc., an Oregon corporation ("SafeDesk") and Phil Autrey, an individual, ("Autrey") collectively referred to herein as the "Seller" and Data Capital Corporation, a California corporation ("Data Capital") the "Buyer". This Agreement is effective upon the date this Agreement is signed by the parties.  This Agreement includes Exhibit "A" (intellectual property) and Exhibit "B" (Phil Autrey's 2008 projections for SafeDesk) which are attached and incorporated by this reference.  The parties hereby agree as follows:

## ARTICLE II.  SALE AND PURCHASE OF IP ASSETS

1. Subject to the terms and conditions in this Agreement, Seller hereby sells assigns, transfers, conveys and delivers to Buyer free and clear title and exclusive ownership of, and Buyer hereby purchases the exclusive rights to all of the Seller's intellectual property, which includes, but is not limited to:

   a) SafeDesk's and Autrey's prior and current intellectual property consisting of computer and machine software, software code and software products, hardware, patents, copyrights, trademarks, service marks, web sites, products and customer lists, and

   b) SafeDesk's and Autrey's prior and current intellectual property including, but not limited to those specific products listed in the attached Exhibit "A", and

   c) Any new intellectual property which may be created, developed or to which SafeDesk or Autrey may acquire an ownership interest in during the term of and pursuant to this Agreement.

2. All of the preceding intellectual property assets referenced above are hereinafter referred to collectively as "IP Assets".

3. After the completion or expiration of this Agreement or non-competition term, if Autrey departs from the employment of Data Capital, Autrey is free to develop other new software and retain ownership rights thereto.

## ARTICLE III.  PURCHASE PRICE AND PAYMENT

1. Data Capital is a California state corporation in good standing and the outstanding common stock of the Data Capital has been fully authorized, and validly issued and are fully paid, non-assessable and free and clear of all liens, claims, pledges and encumbrances.  The consideration for

the sale and transfer of the exclusive rights to all IP Assets, Buyer hereby agrees to the payment of the following purchase price:

2. Upon execution of this Agreement, Data Capital will transfer ONE PERCENT (1%) of its outstanding common stock to SafeDesk for the exclusive rights to all IP Assets.

3. After the execution of this Agreement, Data Capital hereby grants to SafeDesk for a period not to exceed the earlier of either the dissolution and integration of SafeDesk into Data Capital or within EIGHTEEN (18) months (See **Exhibit "B"**), from the effective date of this Agreement, a limited license to use the heretofore mentioned IP Assets being sold and transferred to Data Capital, to generate revenue in SafeDesk's name consistent with the below indicated revenue growth in Article III Paragraph 5 and other provisions of this Agreement prior to SafeDesk's dissolution and full integration into Data Capital.

4. It is understood and agreed by SafeDesk that any and all developments, extensions and any and all other improvements made to or based upon the IP Assets hereinabove will vest entirely and exclusively in Data Capital as its sole property and any license or assignment for use of the IP Assets to SafeDesk will expire upon either the dissolution of SafeDesk or within Eighteen (18) months after the effective date of this Agreement, whichever occurs first.

5. Upon the completion of the following events, Data Capital will transfer an additional ONE PERCENT (1%) of its outstanding common stock to SafeDesk upon SafeDesk satisfying the following conditions:

a) SafeDesk's sales revenue, including the use of the above referenced IP Assets, reaches a target of $2,003,884.00 (TWO MILLION THREE THOUSAND EIGHT HUNDRED EIGHTY-FOUR US DOLLARS) in annual sales revenue. (See Exhibit "B"); and

b) Elimination of SafeDesk's balance sheet debt, including all taxes and related debt. If all such debt is not eliminated within the contemplated EIGHTEEN (18) months time period, this condition will be reviewed by Data Capital and this condition may be altered or extended by mutual written consent of the parties; and

c) Upon SafeDesk's completed dissolution as a separate entity and full integration into Data Capital, Phil Autrey will become a full-time/ direct employee of Data Capital.

6. If all conditions in Article III Paragraph 5 above are met, including the elimination of the balance sheet debt, sooner than the EIGHTEEN (18) months, then the integration of SafeDesk and other provisions of this Agreement will be accelerated to match the completion of the conditions. Further, upon completion of all conditions in Article III Paragraph 5 above, all assets of SafeDesk, including all required labor, will be transferred and acquired by Data Capital.

7. *Time is of the essence in this Agreement. The expected and maximum time frame for the completion of the above conditions is upon either the dissolution of SafeDesk or within Eighteen (18) months after the effective date of this Agreement, whichever occurs first.* **This Eighteen**

ASSET SALE AND PURCHASE AGREEMENT

(18) month time period can be extended at any time by mutual, written agreement among all of the parties. Oral or implied agreements are not authorized and are void and without effect.

8. Upon the successful development of new software, software platforms or hardware ("new software") by SafeDesk for Data Capital and which is approved in writing by Data Capital as revenue generating, Data Capital will transfer an additional  ONE-HALF PERCENT (1/2%)  of its outstanding common stock to SafeDesk for each approved, revenue generating based new software products up to ~~three (3)~~ such products for a total of no more than  ~~ONE AND~~  Two (2%) ~~ONE-HALF PERCENT (1 AND 1/2%)~~ of its current outstanding common stock. This transfer of shares based upon the approval by Data Capital is not limited by the time frame in this Agreement.

9. After execution of this Agreement, Autrey will report to Data Capital's Chief Operating Officer who will oversee all matters related to SafeDesk's profit and loss and, during the pendency of this Agreement, be entitled to receive and review all financial statements and periodic financial and sales reports generated by SafeDesk for its Board of Directors or any other party or entity.

10. Data Capital will be entitled to appoint one director to SafeDesk's Board of Directors during the pendency of this Agreement. Data Capital will be entitled to receive and review all financial statements and periodic financial and sales reports generated by SafeDesk for its Board of Directors or any other party or entity.

## ARTICLE IV. LIABILITIES, BULK SALES LAW, AND SALES TAX

1. It is understood that, except as otherwise expressly provided in this Agreement, Buyer is not assuming any of Seller's liabilities or obligations, and Seller agrees to pay and discharge all of its liabilities and obligations promptly as due and in due course.

2. Buyer and Seller waives compliance with the requirements of the bulk sales law as provided in their respective states under California Commercial Code Division 6, and under the applicable Oregon Commercial Code, but each retains all of its rights and defenses.

3. Seller and Buyer agree to pay, on an equal basis, any sales or use taxes arising from the sale and transfer of all IP Assets effected by this Agreement.

## ARTICLE V. LEASE AND OTHER OBLIGATIONS

The parties acknowledge that Seller's existing equipment or the use and occupancy of its business premises, may be under a lease, but Buyer is NOT assuming any obligations under any

of Seller's lease(s).

## ARTICLE VI.  SELLER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS

Seller represents, warrants, and covenants to Buyer as follows:

### 1. Approval, Authority, and Ownership

SafeDesk is a Oregon state corporation in good standing and all director and shareholder approvals required for Seller to enter into this Agreement and sell the above IP Assets have been duly obtained, and Seller has full power, authority, and ownership to enter into this Agreement and to effectuate all of the transactions contemplated, without any conflict with any other restrictions or limitations, whether imposed by or contained in Seller's Articles of Incorporation or Bylaws, or by or in any law, legal requirement, agreement, or otherwise.

### 2. IP Assets Condition

All of the IP Assets transferred under this Agreement are in good condition and repair and are fit for the particular purposes for which they are intended to be used, and all of Seller's IP Assets being transferred herein, are, to Seller's knowledge as of the date of this Agreement, solely and exclusively owned by Seller without any infringement on any rights of others.  Seller will provide a release and transfer of any and all rights to the IP Assets from any person who may have participated in the development of or may claim an interest in the IP Assets to Data Capital upon request by Data Capital.

### 3. Claims and Litigation

There are no lawsuits, threats of litigation, claims, or other demands affecting or involving Seller's IP Assets involved in this purchase.

### 4. Seller's Knowledge and Disclosure

Seller does not know, or have reason to know, of any matters, occurrences, or other information that has not been disclosed to Buyer and that would materially and adversely affect the IP Assets purchased by Buyer or its conduct of the business involving such IP Assets.  Moreover, no representations or warranty by Seller in this Agreement, or any documents furnished to Buyer by Seller, contains or will contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements contained in these sources accurate.

### 5. Seller agrees and covenants as follows:

No later than Eighteen (18) months from the date of this Agreement, Seller will have paid off SafeDesk's debt and dissolved SafeDesk as a legal entity and business and provide to Buyer the certificate of Dissolution for SafeDesk.

### 6. Autrey agrees and covenants as follows:

a) During and up to the time period Eighteen (18) months from the date of this Agreement,

ASSET SALE AND PURCHASE AGREEMENT

Autrey will work as a part-time independent contractor for Data Capital and assist Data Capital in the contracting of customers that either SafeDesk or Data Capital or both bring to Data Capital for the providing of services and products based upon the IP Assets purchased herein.

b) No later than Eighteen (18) months from the date of this Agreement, Autrey will have completed the dissolution of SafeDesk and will have entered into an employment contract and begun work for Data Capital. It is understood the actual and complete terms of the contemplated employment contract between Autrey and Data Capital will be a matter set forth in full in a separate employment contract between Autrey and Data Capital.


## ARTICLE VII.  BUYER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

Buyer represents and warrants that it has full authority and approval to enter into this Agreement and to effect all of the transactions contemplated to be performed by Buyer in this Agreement, and covenants that it will make all payments and perform all such action as required of it by this Agreement.


## ARTICLE VIII.  EMPLOYMENT CONTRACTS

1.  Buyer does not assume nor is Buyer obligated to perform any part of any of Seller's contracts or agreements regarding any past, present or future employees, officers, or directors for any employment, stock, pension, bonus, commission or other compensation that may be owed by Seller.

2.  However, as set forth ~~above~~ below, it is contemplated that Phil Autrey will enter into an agreement whereby Autrey will act as a part-time independent contractor to perform services for Data Capital during and up to the time period of no later than Eighteen (18) months from the date of this Agreement. Upon the dissolution and windup of SafeDesk, it is also contemplated that Phil Autrey will enter into a separate agreement whereby Autrey will become a full-time employee of Data Capital.

3.  Although the exact terms of the employment contract between Autrey and Data Capital will be set forth in and subject to the terms of the separate employment contract between Autrey and Data Capital, in general terms, it is contemplated that Autrey and Data Capital will enter into an employment contract no later than Eighteen (18) months after the signing of this Agreement and upon the dissolution and windup of SafeDesk and the employment contract is expected to provide the following:

a)  Autrey and Data Capital will have entered into a separate employment contract.

b)  Autrey's function and job description is expected to be director of product marketing and application development.

c)  Autrey will be paid $80,000.00 (EIGHTY THOUSAND U.S. DOLLARS) per annum.

ASSET SALE AND PURCHASE AGREEMENT

Autrey's annual salary will be adjusted consistent with SafeDesk's revenue. Metrics will be developed to monitor new product development, gross revenue, debt reduction, and net profit.

  **d)** Autrey will receive a stock option for Data Capital common stock of  ONE PERCENT (1%)  of its outstanding common stock to Phil Autrey, to vest in equal installments over a   48  (FORTY-EIGHT)   month time period.

  **4.** It is understood the actual and complete terms of the contemplated employment contract between Autrey and Data Capital will be fully set forth in full in a separate employment agreement between Autrey and Data Capital.

## ARTICLE IX.  TERMINATION AND DEFAULT

  **1.** This Agreement may be terminated at any time by Data Capital for cause in its sole discretion. 'Cause' includes failure or inability to meet and complete the goals outlined in Article III, Paragraphs 1 through 10, and includes misrepresentations of Seller's representations, warranties and covenants which are set forth in Article VI Paragraphs 1 through 6.

  **2.** Each stock transfer event is deemed final and complete.

## ARTICLE X.  NON-COMPETITION, NON-DISCLOSURE

Whereas Buyer is in the business and market of providing service and maintenance contracts for computers, servers and other such machines;
Whereas Seller is in the business of developing software and software products, and hardware;
Whereas Buyer is acquiring the exclusive rights to all of Seller's IP assets to enhance and expand the Buyer's business and product lines;

**It is agreed and resolved that:**
  **1.** During the pendency of this Agreement, SafeDesk and Autrey will carry on its business activities in substantially the same manner as previously carried out and will use their reasonable efforts to preserve and enhance existing relationships with vendors, customers, and others having business relationships with Seller.

  **2.** Nothing in this Agreement shall relieve Buyer or Seller and their respective representatives and agents of any obligation to maintain the confidentiality and non-disclosure of the parties' respective financial, trade or other business secrets.

  **3.** Seller will not enter or compete against Buyer in the Buyer's current business nor will Seller continue in the Seller's current business for a period of three (3) years at the expiration or termination of this Agreement, anywhere in the United States of America, Canada, Mexico, the

ASSET SALE AND PURCHASE AGREEMENT

European Union or the rest of the world.

## ARTICLE XI.  NOTICES

All notices or other communications shall be in writing and shall be personally delivered or, if mailed, sent to the following relevant address or to such other address as the recipient party may have indicated to the sending party in writing:

**If to Buyer,**                                                **with a copy to:**

Data Capital Corporation
Attn: Pete Paine, C.E.O.
2674 N. First Street, Suite 103
San Jose, CA 95134

Tel: 800-992-9574
Fax: 408-472-3827
E-mail: ppaine@datacapital.com

**If to Seller**                                                **with a copy to:**

SafeDesk Solutions
Attn: Phil Autrey,
120 N. Pine Street #162
Spokane, WA  99202

Tel: 866-465-8636
Fax: 509-536-0565
E-mail: sales@safedesksolutions.com

Any such notice shall be deemed given as of the date as personally delivered, sent by fax or e-mail, or mailed, if mailed by certified or registered mail, return receipt requested, or sent by FedExp, overnight mail, or a similar service.  If otherwise mailed, the notice shall be deemed given as of the earlier of the fourth business day after mailing or actual receipt.

## ARTICLE XII.        CONSTRUCTION AND GOVERNING LAW

Except as otherwise provided, this Agreement:

1.  ENTIRE AGREEMENT.  Covers the entire understanding of the parties regarding its subject

ASSET SALE AND PURCHASE AGREEMENT

matter, superceding all prior agreements and understandings, and no modification or amendment of its terms or conditions shall be effective unless in writing and signed by all of the parties.

2. **SUCCESSORS AND ASSIGNS.** Inures to the benefit of, and is binding on, the respective successors, assigns, distributees, heirs, and personal representatives of the parties.

3. **HEADINGS.** Shall not be interpreted by reference to any of its titles or headings, which are inserted for purposes of convenience only.

4. **WAIVER OR RELEASE.** Is subject to the waiver and release of any of its requirements, as long as the waiver or release is in writing and signed by the party to be bound, but any such waiver or release shall be construed narrowly and shall not be considered a waiver or release of any further, similar, or related requirement or occurrence, unless expressly specified.

5. **GOVERNING LAW.** Is made in, and shall be construed under, the laws of the State of California, without giving effect to principles of conflicts of laws. Venue for all purposes is in Santa Clara County, California.

6. **AMENDMENT OR MODIFICATION.** May be amended, modified or supplemented only by a written instrument executed by the party against which enforcement of the amendment, modification, or supplement is sought.

7. **SEVERABILITY.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable, that provision shall be fully severable, and this Agreement shall be construed and enforced as if the illegal, invalid, or unenforceable provision were never a part of the Agreement; the remaining provisions shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance (except to the extent the remaining provisions constitute obligations of another party to this Agreement corresponding to the unenforceable provision); and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Agreement, a provision as similar in its terms to the illegal, invalid, or unenforceable provision as my be possible and be legal, valid, and enforceable.

8. **INTERPRETATION.** This Agreement shall be construed according to the fair meaning of its language. This Agreement shall be deemed to have been mutually drafted by all of the parties and not by any single party. Whenever the term "including" is used in this Agreement, it shall be interpreted as meaning "Including, but not limited to" the matter or matters thereafter enumerated.

9. **THIRD PARTY BENEFICIARIES.** Nothing in this Agreement is intended to confer upon any person other than the parties hereto and there successors and permitted assigns any rights or remedies under or by reason of this Agreement.

ASSET SALE AND PURCHASE AGREEMENT

10. COUNTERPARTS. May be executed in one or more counterparts, all of which, together, shall be deemed to constitute one and the same Agreement.

11. EXECUTION OF DOCUMENTS. All parties agree to execute such other documents as reasonably necessary to effectuate the terms and intent of this Agreement within ten (10) days of written request, including, but not limited to, Exclusive Software Agreement, Employment Agreement, Software Development Agreement, Non-compete Agreement.

12. KNOWLEDGE. Each of the parties warrants that they have carefully read this Agreement in it entirety; that it knows the contents of this Agreement; that they have conferred with their counsel regarding the meaning and effect of the Agreement or they waive review by counsel; that they are satisfied with the terms of this Agreement; and that they have signed this Agreement freely and voluntarily, and with the absence of duress and/or undue influence.

IN WITNESS, the parties have executed this Agreement as of the day and year first written below:

("Seller")                                          SAFE DESK SOLUTIONS, INC., an Oregon
                                                    state corporation

Date: 6/8/07                      BY

                                                    Phil Autrey, President

("Seller")                                          PHIL AUTREY

Date: 6/8/07                      BY

                                                    Phil Autrey

("Buyer")                                           DATA CAPITAL CORPORATION, a
                                                    California state corporation

Date: 6.8.07                      BY

                                                    Pete E. Paine, C.E.O.

ASSET SALE AND PURCHASE AGREEMENT

Page -9-

## EXHIBIT "A"

1.  Exclusive rights to all of Seller's prior, current and future intellectual property, including any new intellectual property which may be created, developed or to which Seller may acquire an ownership interest in, during or after this Agreement is entered, and includes, but is not limited to, software and software products, hardware, patents, copyrights, trademarks, service marks, web sites, products and customer lists,

2.  All Intellectual Property, all Hardware and Software products, whether existing currently or developed in the future, along with any improvements or upgrades to the same.

3.  Hardware and Software Products includes, but is not limited to:

   a.  SafeDesk Terminal Server Enterprise Edition

   b.  SafeDesk Terminal Server Open Source Edition

   c.  SafeDesk Point Of Sale Edition

   d.  SafeDesk Thin & Hybrid Clients

   e.  SafeDesk Bootable Network Interface Cards (NIC)

EXHIBIT A

EXHIBIT 2

## CONFIDENTIALITY AGREEMENT

**THIS AGREEMENT** made on                                                                 2007

between the following Parties (the "Parties" and individually a "Party"):

(1) **British Telecommunications plc ("BT")**, a company registered in England and Wales, whose registered office is at 81 Newgate Street, London EC1A 7AJ, England, and whose registered number is 1800000; and

(2) **Data Capital Corporation ("Data Capital")**, a California state corporation whose registered office is at 2674 N. First Street, Suite 103 San Jose, CA 95134, USA; and

(3) **Safe Desk Solutions, Inc. ("Safe Desk")**, an Oregon state corporation whose registered office is at [ENTER REGISTERED OFFICE ADDRESS].

**Background**

(A) The Parties are considering entering into a possible transaction or arrangement together, which will involve disclosing information to each other.

(B) This will include information concerning each Party and/or its Group Companies, and the Parties wish to regulate how such information will be protected.



(D) BT has expressed an interest in evaluating Safe Desk's thin client and virtualization software, devices and architecture (hereinafter referred to collectively as "Thin Client IP") for a certain period.

**Agreement**

In consideration of their respective obligations, the Parties agree as follows:

**1. Definitions**

In this Agreement:

"BT Wholesale Information" means information which BT from time to time identifies to the other Party as being commercially confidential, or is by its nature commercially confidential, to the BT line of business known as "BT Wholesale";

"Confidential Information" means any and all information, whether disclosed orally or in writing or in any other form including without limitation released or unreleased Disclosing Party software, software code, hardware products, or devices or architecture, marketing or promotion of any Disclosing Party product, and whether disclosed before, on or after the date of this Agreement, owned or controlled by, or relating to the business or affairs of, the Disclosing Party in question or any of its Group Companies and disclosed by such Disclosing Party to the Recipient in question in relation to the Purpose;

"Disclosing Party" means a Party disclosing Confidential Information to a Recipient;

"Group Companies" means in relation to a Party, its ultimate holding company and the direct and indirect wholly owned subsidiaries (other than such Party) of such holding company;

"Openreach Information" means information which BT from time to time identifies to the other Party as being commercially confidential, or is by its nature commercially confidential, to the BT line of business known as "Openreach".

"Other Party(ies)" means a Party(ies) who, in respect of the relevant Confidential Information, is or are neither the Disclosing Party nor the Recipient;

"Purpose" means the use of Confidential Information for the purposes of the Recipient in question considering whether it (or one or more of its Group Companies) should enter into a Transaction, and having discussions with the other Parties about a possible Transaction;

"Recipient" means a Party receiving Confidential Information directly from a Disclosing Party;

"Representatives" means, in relation to a Recipient or the Other Party(ies), their respective, and any of their respective Group Companies', officers, staff, professional advisers and subcontractors who: - (i) need to have access to any Confidential Information for the Purpose; (ii) have been made aware of the provisions of this Agreement and such Recipient's obligations under it; and (iii) have been and are bound by confidentiality and usage obligations in respect of the Confidential Information no less onerous than the obligations of such Recipient in this Agreement; and

"Transaction" means a transaction or arrangement among the Parties or any of their respective Group Companies concerning the possible use by BT of Safe Desk's Thin Client IP, or similar thin client IP which is owned and/or developed by Safe Desk.

## 2. Duration

The obligations of the Parties under this Agreement will cease to have effect 5 years after the date of this Agreement. Such cessation shall not, however, prejudice any then accrued rights in respect of any breaches of this Agreement or the continuation in force of any provisions necessary to assert or enforce any such rights.

## 3. Obligations

3.1 Subject to clause 4 below each Recipient shall, and shall procure that its Representatives shall, :

3.1.1 use Confidential Information only for the Purpose;

3.1.2 keep Confidential Information confidential;

3.1.3 permit access to Confidential Information only to such Recipient's Representatives and/or the Other Parties' and/or the Other Parties' Representatives for the Purpose;

3.1.4 not copy Confidential Information except as necessary for the Purpose;

3.1.5 not delete any confidentiality and/or proprietary notices or legends appearing on the original Confidential Information as disclosed by or for the Disclosing Party in question; and

3.1.6 in disclosing any Confidential Information as permitted by this Agreement, comply with any applicable laws controlling or relating to the export of information.

3.2 Subject to clauses 3.3 and 4 below, the Recipient in question shall within 10 days following the Disclosing Party's written request: (i) deliver to the Disclosing Party or, at the Disclosing Party's option, destroy (including the permanent deletion of any electronic copies)

all originals and copies of Confidential Information which the Recipient may have or control; and (ii) confirm in writing to the Disclosing Party that the Recipient has complied with such request.

3.3 Notwithstanding clause 3.2 above, the Recipient may, subject to the other provisions of this Agreement, retain in its records one copy of any Confidential Information that it has been obliged to disclose in accordance with clause 4.5 below.

3.4 Except with BT's prior written consent, and without prejudice to each of the other Parties' other obligations in this clause 3, each of the other Parties to this Agreement shall not disclose:

    (a) Openreach Information to any BT employee, agent or contractor unless such other Party knows that such BT employee, agent or contractor is employed within or by Openreach; or

    (b) BT Wholesale Information to any BT employee, agent or contractor unless such other Party knows that such BT employee, agent or contractor is employed within or by BT Wholesale.

## 4. Exceptions

The Recipient's obligations in clauses 3.1 and 3.2 above shall not apply to Confidential Information to the extent that:

4.1 It was already in the lawful possession of such Recipient and at its free disposal without any obligation of confidence before the first disclosure of it by the Disclosing Party in question to such Recipient; or

4.2 it is or has been lawfully disclosed to such Recipient by a third party without any obligations of confidence; or

4.3 it is in or comes into the public domain other than through a breach of this Agreement; or

4.4 it is or has been created independently by or for such Recipient without use or knowledge of Confidential Information; or

4.5 such Recipient is obliged to disclose it by law or to meet the order or requirements of any competent court of law, governmental or statutory regulatory authority, or stock exchange, to which such Recipient is subject from time to time. Before making any such disclosure, the Recipient shall, to the extent that it is not prevented from doing so by such law, order or requirement; (i) first promptly notify the Disclosing Party in question in writing of the details of the ordered or required disclosure; and (ii) if so requested and so far as is reasonable, assist such Disclosing Party, at such Disclosing Party's cost, in seeking a protective order or other assurance with respect to maintaining the confidentiality of such Confidential Information.

## 5. Status of Agreement

5.1 Neither the entry into this Agreement, nor the disclosure or receipt of Confidential Information, nor the carrying on of any discussions or negotiations about a possible Transaction, shall constitute or imply any offer, representation, commitment or promise by any of the Parties: (i) to enter into any further agreement; or (ii) to sell or purchase any product or service; or (iii) (except as expressly provided in Clause 3 above) to grant any intellectual property right or licence.

5.2 No Disclosing Party gives any representation, warranty or undertaking to any Recipient as to the accuracy or completeness of any Confidential Information (except so far as agreed otherwise by such Disclosing Party in any written agreement for a Transaction), and such Disclosing Party shall be under no obligation to update or correct any Confidential Information.

5.3 All Confidential Information is and shall remain the property of the Disclosing Party. By disclosing Confidential Information to the Recipient, the Disclosing Party does not grant any express or implied right to the Recipient to or under any patents, copyrights, trademarks, or trade secret information except as otherwise provided herein. The Disclosing Party reserves without prejudice the ability to protect its rights under any such patents, copyrights, trademarks, or trade secrets except as otherwise provided herein.

5.4 In the event that the Disclosing Party provides any computer software and/or hardware to the Recipient as Confidential Information under the terms of this Agreement, such computer software and/or hardware may only be used by the Recipient for evaluation and providing Feedback (as defined in paragraph 7 of this Agreement) to the Disclosing Party. Unless otherwise agreed by the Disclosing Party and the Recipient, all such computer software and/or hardware is provided "AS IS" without warranty of any kind, and the Recipient agrees that neither the Disclosing Party nor its suppliers shall be liable for any damages whatsoever arising from or relating to the Recipient's use or inability to use such software and/or hardware.

5.5 The Recipient may from time to time provide suggestions, comments or other feedback ("Feedback") to the Disclosing Party with respect to the Confidential Information provided by the Disclosing Party. The Recipient agrees that all Feedback is and shall be given entirely voluntarily and shall be treated as any other Confidential Information provided by the Disclosing Party.

5.6 No Disclosing Party shall be liable for any costs or expenses incurred by or for any Recipient in considering, having discussions about, and/or in preparing for, a Transaction.

5.7 Other than a relevant Group Company, a person who is not a party to this Agreement may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999.

5.8 This Agreement shall bind the successors of each Party.

6. Remedies

Each Recipient acknowledges that if it breaches this Agreement damages may not be an adequate remedy for the Disclosing Party in question and that such Disclosing Party shall (without prejudice to any other rights and remedies) have the right to apply for injunctive relief or for specific performance of such Recipient's obligations.

7. General Provisions

7.1 The rights and obligations in this Agreement are in addition to any confidentiality obligations implied or imposed by applicable law.

7.2 No failure or delay by any Party in exercising any right or remedy under this Agreement shall operate as a waiver of that right or remedy, and no single or partial exercise of any right or remedy shall preclude any further exercise of any right or remedy under this Agreement.

7.3 This Agreement may only be amended by a further written agreement to that effect signed by the Parties.

7.4 If any provision of this Agreement is held to be invalid, illegal or unenforceable (the "Invalid Provision"), the remaining provisions shall be unimpaired and the Parties will in good faith negotiate a substitute provision for the Invalid Provision which as closely as possible meets its intent while at the same time being valid, legal and enforceable.

8. Governing Law and Jurisdiction

This Agreement shall be governed by English law and the Parties agree in respect of it to submit to the exclusive jurisdiction of the English Courts. However, nothing in this Agreement

shall prevent any Party from applying to any other court for injunctive relief or for specific performance or for the enforcement or execution of any judgement or court order.

**SIGNED** for and on behalf of
British Telecommunications plc

.....................................................
Signature

ADRIAN THURLOW
.....................................................
Name

SENIOR RESEARCHER
.....................................................
Position

**SIGNED** for and on behalf of Data Capital
Corporation

.....................................................
Signature

William H. Joseph
.....................................................
Name

Vice President of Business Dev.
.....................................................
Position

**SIGNED** for and on behalf of Safe Desk
Solutions, Inc.

.....................................................
Signature

Phil Autrey
.....................................................
Name

CTO
.....................................................
Position

**EXHIBIT B**

## FIRST AMENDED COMPLAINT (DECLARATION RELIEF; ~~BREACH OF~~ ~~CONTRACT; BREACH OF FIDUCIARY DUTY; INTERFERENCE WITH~~ ~~ADVANTAGEOUS BUSINESS RELATIONSHIPS; INJUNCTIVE RELIEF)~~

PLAINTIFF**, in accordance with the provisions of Rule 15(a)(1)(A), F.R.Civ.P., submits its First Amended Complaint and**, for a claim against defendants, and each of them, alleges:

## GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

1.      Plaintiff is a corporation existing and authorized to do business pursuant to the laws of the State of California, maintaining its principal place of business in San Jose, California.

2.      Defendant SafeDesk Solutions, Inc. ("SafeDesk") is an Oregon corporation maintaining its  principal place of business in Spokane, Washington.

3.      Defendant Phil Autrey is an individual whom plaintiff is informed and believes, and upon  that basis alleges, resides in Spokane, Washington.

4.      Plaintiff is currently unaware of the true names and capacities of the defendants sued herein as DOES 1 through 25, inclusive, and thus proceeds against those defendants by their fictitious names.  When the true names and capacities of the fictitiously names defendants have been ascertained, plaintiff will amend this complaint to set forth those true names and capacities. At all times material hereto each defendant was acting as the duly authorized agent, representative and employee of each of the remaining defendants and, in performing the acts herein alleged, was acting within the course and scope of that agency and employment.

5.      Plaintiff is a provider of IT management solutions and services for large government and telecommunications companies. Defendant SafeDesk is a developer of software. At all times material hereto defendant Autrey was the President and Chief Executive Officer of SafeDesk. Autrey and SafeDesk had developed and owned a variety of intellectual property, collectively referred to herein as the "SafeDesk ~~IP~~**EP**".

6.      Beginning in early 2007 the parties entered into negotiations for, inter alia,  the acquisition by DCC of the SafeDesk IP and other assets of SafeDesk and Autrey. On June 8, 2007 the parties entered into that certain "IP Asset Sale and Purchase Agreement between SafeDesk and Phil Autrey (Seller) and Data Capital Corporation (Buyer)", a true copy of which is attached as Exhibit "1" and incorporated herein by this reference (the "Agreement"). Pursuant to the Agreement, SafeDesk and Autrey transferred ownership to DCC of, inter alia, all of the SafeDesk ~~IP~~**IP**. Plaintiff has performed all terms and conditions of the Agreement required to be performed by it, except as performance has been excused by the acts of defendants.

7.      ~~Subsequent to the parties entering into the Agreement, the parties began communications with British Telecommunications PLC ("BT") concerning the potential licensing and/or sale of certain o f the SafeDesk IP owned by DCC to BT. In connection therewith, on or about July 11, 2007 the parties  entered into that certain Confidentiality Agreement with BT, a true copy of which is attached hereto as Exhibit "2" and incorporated herein by this reference. Included in the "Background" recitals of the Confidentiality Agreement~~

~~was the recital that "Data Capital is the owner of all of Safe Desk's intellectual property consisting of Computer and machine software, software code and software products, . . . which includes . SafeDesk Thin & Hybrid Clients."~~

~~8.    Thereafter the parties jointly prepared and submitted a proposal to BT for sales/licensing of SafeDesk IP owned by DCC. The parties anticipate that, if the proposal to BT is accepted, the parties' profits will be in the millions of dollars.9.  Plaintiff has been advised by defendants~~ **Defendants**, acting through their counsel, ~~that defendants assert~~**have asserted** that they are not bound by the  Agreement, are entitled to rescission of the Agreement and that defendants' ~~rights to pursue the business opportunity with BT "are in no way dependant upon the validity or invalidity of the June 8, 2007 document [the Agreement]." Plaintiff is informed and believes, and upon that basis alleges, that defendants are attempting to usurp the business opportunity of a sale/license to BT for their own benefit, to the exclusion of plaintiff~~**remain the owners of the SafeDesk IP**.

## FIRST ~~CAUSE OF ACTION~~CLAIM FOR RELIEF

### (DECLARATORY ~~RELIEF~~**RELIEF** AGAINST ALL DEFENDANTS)

~~10.~~**8.** Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through ~~9~~**7** above.

~~11.~~**9.** Plaintiff contends that the Agreement is a binding and subsisting contract between plaintiff and defendants~~;~~ **and** that plaintiff's rights under the Agreement include ownership of all of the SafeDesk IP~~, that therefore defendants are not entitled to make use of the SafeDesk IP without the consent of plaintiff, or to make use of the SafeDesk IP~~**for the benefit of parties other than plaintiff; and that any relationship with BT concerning use of the SafeDesk IP is for the benefit of plaintiff**. Plaintiff is informed and believes, and upon that basis alleges, that defendants dispute each of these contentions**, and**~~s in turn contend that the Agreement is not binding and that defendants, and not plaintiff, is the owner of the SafeDesk IP~~.

~~12.~~**10.** Plaintiff is entitled to a judicial declaration of this court resolving the disputes of the parties as hereinabove alleged. Such a determination is necessary and appropriate in order to avoid a multiplicity of actions, and in order that the parties can determine their respective rights and obligations under the Agreement.

### ~~SECOND CAUSE OF ACTION~~

### ~~(AGAINST ALL DEFENDANTS FOR BREACH OF CONTRACT)~~

~~13.    Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.~~

~~14.    Defendants have breached the Agreement by refusing to recognize and by challenging the fact that plaintiff is the owner of the SafeDesk IP, and by acting in derogation of p laintiff s rights as the owner of SafeDesk IP by attempting to negotiate and contract with BT in their own right and in their own name to sell/license portions of the SafeDesk IP to BT.~~

## ~~FOURTH CAUSE OF ACTION~~

### ~~(BREACH OF FIDUCIARY DUTY)~~

~~20.    Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.~~

~~21.    As a result of the agreements and obligations of the parties as set forth in the Agreement, and also as the result of the joint proposal being prepared and submitted to BT, defendants became  fiduciaries of plaintiff and owe plaintiff the obligations of fiduciaries.~~

~~22.    The acts of defendants as herein alleged constitute breaches of defendants' fiduciary duties owed to plaintiff. The acts of defendants that constitute the breaches of fiduciary duty were performed intentionally, with malice, and with an intent to injure plaintiff and its financial interests.~~

~~23.    As the direct and proximate result of the acts of defendants as alleged herein, plaintiff has been damaged in a sum which cannot be presently ascertained, but which plaintiff is informed and believes, and upon the basis alleges, exceeds the sum of four million dollars. Plaintiff is entitled to recover its damages in accordance with proof at time of trial herein.~~

~~24.    The acts of defendants as alleged herein were performed intentionally and maliciously, with an intent to injure and oppress plaintiff Plaintiff is therefore entitled to recover additional damages, as both an example and a penalty, in order to punish defendants for their acts and to deter them from the commission of the same or similar acts in the future.~~

## ~~FIFTH CAUSE OF ACTION~~

### ~~(AGAINST ALL DEFENDANTS FOR INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP)~~

~~25.    Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 above.~~

~~26.    The relationship between plaintiff and BT constituted an advantageous business relationship to plaintiff and defendants were at all times aware of the existence of that advantageous business relationship.~~

~~27.    Defendants have intentionally interfered with the advantageous business relationship between plaintiff and BT in attempting to usurp the business opportunity represented by that relationship as hereinabove alleged, and by attempting to exclude plaintiff from benefiting from that relationship.~~

~~28.    As the direct and proximate result of the acts of defendants as herein alleged, plaintiff has been damaged in a sum which cannot be presently ascertained, but which plaintiff is informed and believes, and upon that basis alleges, exceeds the sum of four million dollars. Plaintiff is entitled to recover its damage from defendants in accordance with proof at time of trial.~~

~~29.    The acts of defendants as alleged herein were performed intentionally and maliciously, with an intent to injure and oppress plaintiff. Plaintiff is therefore entitled to recover additional damages, as both an example and a penalty, in order to punish defendants for their acts and to deter them from the commission of the same or similar acts in the future.~~

## ~~SIXTH CAUSE OF ACTION~~

### ~~(AGAINST ALL DEFENDANTS FOR INJUNCTIVE RELIEF)~~

~~30.    Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through 9 and 26 through 27 above.~~

~~31.    The SafeDesk IP is unique and cannot be readily duplicated. No adequate remedy at law exists for defendants' usurpation and use of the SafeDesk IP owned by plaintiff. Plaintiff will sustain irreparable injury and damage if defendants are allowed to use and sell/license the SafeDesk IP to others.~~

~~32.    Plaintiff is therefore entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining defendants from any use, sale or licensing of the SafeDesk~~

WHEREFORE, plaintiff is entitled to judgment herein against all defendants, jointly and severally, as follows:

1.    ~~On the first cause of action, for~~ **For** a **judicial** declaration that the Agreement is a valid and subsisting Agreement~~,~~ **and** that plaintiff is the owner of the SafeDesk IP as a result of the Agreement~~, and that defendants are not entitled to sell/license the SafeDesk IP to third parties~~;

2.    ~~On each of the second, third, fourth and fifth causes of action, for damages exceeding four million dollars in accordance with proof at time of trial;~~

~~3.    On each of the fourth and fifth causes of action, for additional damages, as both an example and a penalty;~~

~~4.    On the sixth cause of action, for issuance of a temporary restraining order, preliminary injunction and permanent injunction;~~ 5.    For costs incurred herein; and

~~6.~~ **3.**    For such further relief as the court deems appropriate.

Document comparison done by DeltaView on Friday, March 14, 2008 3:34:04 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://CPDBIWOVEN/WorkSite/821237/1 |
| Document 2 | interwovenSite://CPDBIWOVEN/WorkSite/821243/1 |
| Rendering set | CPDB Standard no color |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 21 |
| Deletions | 48 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 69 |